Savings Bank v. United States The restatement states that the mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable. Why isn't that rather narrow characterization, which essentially states the rule of Hadley v. Baxendale, why isn't that the kind of characterization that fits well with this case? Because the loss that actually occurred here, as it relates to the contract, was the loss of the goodwill. The particular asset was not the subject of the contract. The subject of the contract was the goodwill. But with the damages, the loss, the injury of which you're complaining, is the ultimate loss of the profits of RFC. So goodwill is not the damage. What the restatement seems to be saying is you have to point to the ultimate injury as having been foreseeable, not just in general, but the specific kind of injury. And I think this Court answered that question, Judge Bryson, in both Citizens Federal and Fifth Third. Both those cases first reiterate CalFed and also the Supreme Court statement in Winstar that the purpose of these contracts was to leverage up the goodwill, take more assets on your books, generate profits. And it was foreseeable that if you take away the goodwill, the bank would either have to sell assets or raise capital, and it's entitled to the damages it incurs in doing so. And in Citizens, Citizens was a case where the plaintiff was requesting damages not for the cost of replacing its capital, but for certain adverse tax consequences that it suffered as a result of that capital raising. And this Court said that it was a sufficient finding that it was foreseeable that the thrift would have to replace the goodwill. And it then goes on to say there is no requirement that the particular method used to raise that capital or its consequences be foreseeable. So the Court there was not concerned with how the thrift raised its capital, only that the thrift had to raise capital. Moreover, it then went on and found that these ancillary tax consequences that flowed from the capital raising were also foreseeable. Fifth Third is very much the same. There, the plaintiff had to sell prematurely in 1991 certain branches that it claims it would have held and sold in 1998 for a higher price. And again, this Court said that the need to raise capital was foreseeable. The thrift was not required also to show that the precise economic conditions were foreseeable. And so I think those cases respond to your question and show that the loss, the foreseeable loss, the type of loss at issue in these cases is the loss of the goodwill and the need to raise capital by selling assets or by some other capital raising measure. Deal with the Lincoln Bank case, will you, that says discourages lost profits at least. I would dispute that characterization, Judge Rader. Lincoln is distinguishable on two points. First, as it clearly says, it is not a lost profits or expectancy damages case. Second, the plaintiff in Lincoln did not claim that it would have been in some better position sometime post-breach than it was at the time of breach. And I think it's important to look at the Lincoln decision because it begins by quoting energy capital. And it notes that there is, it first notes the general rule that contract damages are measured as of the date of the breach. But then it goes on to note the exception to that rule. And for the exception, it quotes energy capital. And that exception is, quote, for profits that would have accrued over the course of the contract. In those circumstances, damages are measured throughout the course of the contract. So that is Lincoln reconfirming what this court held in energy capital. The Lincoln court then goes on to say, but this is not a lost profits case. The plaintiff tried to prove lost profits at trial. The trial court found that they were not provable with reasonable certainty. And so it turned to the lost value of the deposits as an alternative form of measure. And in that context, in measuring value, then yes, you look to the fair market value as the best available proof. But in terms of putting the plaintiff in the position that it would have been in but for the breach, when lost profits are available as a measure of damages, they are awardable. And if you look at the various authorities that Lincoln cites, starting with Schoenfeld, which is the Second Circuit decision, that too was a case where the plaintiff failed to prove lost profits. The Second Circuit noted that lost profits and fair value are separate and distinct categories of damages. And it then went on to consider the lost value as an alternative measure. Dobbs, Corbin, Williston, all cited in Lincoln, make that same distinction. And they say that you don't get both, but they are alternative measures of damages. Can you address as well the NAMCO purchase seven years after the RFC sale? How is that a mitigation? It's even operated in a different market than the jumbo mortgage market of the RFC venture. The key to understanding NAMCO is mitigation, Your Honor, is to understand that beginning in the 1980s, Anker had a consistent and coherent strategy of getting out of the traditional thrift model of originating mortgages at retail and holding them as whole loans in portfolio as investments, which is what led to the thrift crisis in the first place. And Anker's strategy was to expand out of that into the mortgage banking market. Where Anker could acquire loans wholesale, where it could convert those mortgages and resell them as mortgage-backed securities, retain the servicing rights on those mortgages as a source of non-interest rate sensitive fee income, where it could use that mortgage banking subsidiary in order to take Anker's own loans, securitize them, primarily as a means of taking fixed rate loans off the books, converting them to arms, taking whole loans, converting them to mortgage-backed securities. That was what the suburban coastal deal was all about. So the suburban transaction facilitated that strategy. The breach interrupted that strategy by forcing Anker to sell RFC. As soon as Anker came back into capital compliance, it began looking to resume that strategy, and NAMCO represented its first opportunity. The trial court had it right because it looked at it from the standpoint of the benefits that the bank derived from NAMCO and RFC. And those benefits were a nationwide scope of business to diversify geographically. It provided a wholesale volume of loans much more efficiently without the need for brick-and-mortar retail offices. What about the seven years? Is that all recovery period? Yes, Your Honor. Anker did not fully come back into capital compliance. There was a series of stages Anker had to go through to comply with FIREA, and then it had to comply with FDICHA, the second statute that upped the capital requirements. Anker did not fully come out of compliance with those statutes until 1993 or 1994. Mortgage banking subsidiaries. And then it had to build a cushion to where it would have the capital to make this kind of acquisition. Ninety-three would be four years later. Well, the government has never claimed that Anker could have or should have mitigated sooner, Your Honor. Anker undertook some deals as part of its other recuperation. It tried to acquire some branch networks that it was unable to do. But there has been no evidence presented in the record that Anker had the ability or the opportunity to mitigate before 1997. But the key fact is that in all particulars, as Anker was interested, they were identical. They provided the exact same benefits. The one distinction between NAMCO and RFC is that RFC sold these private label jumbo mortgage-backed securities. And the interesting fact there is in 1996, NAMCO determined to get into that market. But that's not why Anker bought RFC. Anker didn't say, we want a private label conduit. Anker said, we want a mortgage-backing conduit that provides us volume of loans, the ability to restructure our loan asset portfolio, a steady source of non-interest-dependent fee income, the float on the loans that the bank, that the subsidiary carried on Anker's warehouse. That's the largest part of this damages, isn't it, is this mitigation cost? That's correct, Your Honor. And so the trial court made detailed specific findings that, and I'll quote here, resolved the bank's need for substantial origination volume, diverse geographic footprint, sophisticated mortgage-backing operation, and reliable source of non-interest fee income. Both assets provided the exact same benefits to Anker. If you could address Old Stone Corporation, the court in Old Stone doesn't, I guess, quite say you'll never find a win-star case in which lost profits are appropriate, but they come pretty close. They say that we never have, and they say that in numerous cases we have rejected claims for lost profits on the ground, that lost profits are too speculative to be recovered. Now, what is it about this case, now turning to foreseeability now, that distinguishes it from not only Old Stone but all the other cases that Old Stone alludes to in which lost profits have been rejected as lacking the element of foreseeability? To begin with, Your Honor, I would cite you five cases where this court has affirmed lost profits awards, and those would be Astoria, Rochester, Globe, LaSalle, and Commercial Federal. So it is not true that this is the one-off lost profits case. How are we distinguishable from Old Stone? Old Stone, in fact, was not a lost profits case. The claim there was for the cost of replacement capital. Right, and recognizing that this language is arguably dictum, but nonetheless it's pretty considered dictum, and it goes on for a page. What is it about that analysis that makes it inapplicable, you think, to this case? In most other cases, including the ones I just cited, the plaintiff has come to this court and said, if we had had this additional capital, we would have leveraged it into some bucket of investments, like the type we already have. But I don't believe any of those cases said, here is the asset that we own that we would have continued to own. So as I said at the outset, the distinction here is, here is an asset that we already owned, here is an asset that had a tangible lost profits stream, that we're not postulating we can actually observe and measure in the marketplace. Right, and that works, at least arguably works, for your quantum of damages, but it doesn't seem to me it works for your foreseeability. And what Old Stone, the language in Old Stone was talking about, is foreseeability. And there, you don't have the asset in hand. You had, perhaps, a hope down the line to purchase the asset, but you don't have the situation that you were just describing is not present in 1983. The situation being that we didn't own... You don't have the asset already. In other words, you don't have a particular asset which has a readily foreseeable course of profit making. But again... With a particular strategy. Taking the discussion we just had about NAMCO and RFC, I would apply the very same logic to RFC and Suburban Coastal. And those were virtually identical companies from the perspective of Anchor and the benefits that Anchor received. And the government sold Suburban Coastal to Anchor as part of one of the underlying contractual acquisitions. The government was encouraging thrifts to get into mortgage banking for these very reasons of solving the problems that had created the thrift crisis in the first place. Other thrifts already owned conduits, private label conduits, like RFC, in 1983 when the government sold Anchor Suburban Coastal. And so there is nothing that says you have to own that asset. What is clearly the case is that it was foreseeable that Anchor would have owned that type of asset because the government sold Anchor that type of asset. And in the government's 1988 exam report of Anchor, it notes that the purchase of RFC was consistent with the bank's business plan, which is our very point. We had a consistent strategy beginning in the early 1980s. The government facilitated, encouraged, and was certainly aware of, and the purchase of RFC was entirely consistent and predictable within that strategy. Thank you. Any more questions? Thank you, Mr. Fountain. Mr. Todor, would you enlarge Mr. Todor's time by the amount we've run over? Proceed. First, with respect to the questions on causation, it wasn't just the memo from Mr. Larch, the CEO, to the board that explained the risk-based requirements. It was Anchor's SEC filings, as we find in A201281 of the record in their SEC filings, explaining the reasons for the sale. Anchor stated that the capital plan also included the sale of RFC due to significant risk-based capital requirements that would be imposed on Anchor by FIREA with respect to operating a subsidiary of this nature. They said nothing about the breach or their capital levels being the reason for their sale. It was solely the risk-based capital requirements. They affirmatively identified what the reason was, and it was not the breach. But I think Anchor would tell us that in their breach position, they were being exactly accurate. They couldn't meet these regulatory requirements because the breach had already endangered them so much. The risk-based capital requirements and the breach were both part of FIREA. Anchor only mentioned the risk-based capital requirements. They did not mention the breach. They did not mention their capital levels, and there were good reasons for that because the risk-based capital requirements made it more capital-intensive for a thrift like Anchor to operate RFC compared to an unregulated entity like GMAC that did not deal with those. But, you know, it seems to me, and maybe this may just be my view and not shared by my colleagues, but on causation, it seems to me you are going right in the teeth, more than on either of the other two issues, of a very extensive analysis of each of these factors, all of this evidence by the finder of fact who, after weighing this evidence, came out against you. And I just have a hard time seeing our way clear to say, you know what, Judge Block did not correctly assess the Lange Memorandum, let's say, or the SEC filing in context and weighed against the other factors. So where you're going at specific factual issues like that, you've got a rough road to hoe, I think. Well, the plaintiffs have a rough road to contradict their own SEC filings where they affirmatively stated why they sold it and it wasn't the breach. And Judge Block looked at that evidence, looked at all of the evidence, and concluded that, sure, the risk-based capital requirements have effect. He wrote a book about this. I have 150 pages. They had an effect. Risk-based capital requirements had an effect. But they wouldn't have been enough without the breach. The finding that the risk-based capital requirements, they could have gotten around them if they did all these complicated financial maneuvers promulgated by their experts for trial. Anker's executives weren't aware of any of those mechanisms at the time they made the decision to sell RFC. So that itself is speculative. But Anker affirmatively stated the reason and it wasn't the breach. With respect to First Federal Lincoln, First Federal Lincoln applies to the quantum of damages notwithstanding whether the quantum of damages would otherwise be foreseeable. If the form of damages is the disposition of an asset, page 1317, First Federal Lincoln said the most accurate measure of damages is the difference between what was received and what the value would have been but for the breach at the time of the breach, not the lost profits the asset would have generated in the future. With respect to the Court's question as to whether the quantum of damages must have been foreseeable, yes, it had to have been foreseeable. That's a separate requirement from the proper way to measure damages, which as First Federal Lincoln instructs, in the case of a disposition of an asset is the change in value at the time of breach. With respect to energy capital, energy capital did state the general rule that damages should be measured for a breach of contract at the time of the breach. There is an exception to that rule recognized in energy capital and that information was not available, but that information was available here because there was a disposition of an asset. There was a readily ascertainable market value and therefore the default rule under energy capital that contract damages should be measured at the time of the breach also applies here and the trial court was in error in not applying that rule of applying the damages at the time of the breach. Also, with respect to foreseeability, the fact that Anchor did not own RFC at the time of contracting only contributes to the fact that it was highly unforeseeable that they would acquire that company, that they would have to sell it rather than other things. Appendix page 209-14 in the capital plan, they state that they had alternative assets that they could sell that would raise $72 million in capital and would not have an adverse impact on the franchise. Mr. Large, the CEO, testified that at page 100, 537 and 38 that he did not personally believe that the things that Anchor was selling, including RFC as part of the capital plan, would have an adverse impact on its franchise either. If Anchor could not foresee harm at the time of sale, there was no way the government could have foreseen that harm 5 years earlier and there was also no reason to depart from the default way to measure contract damages at the time of breach in this case. Which would be the difference between $67 million and $64.4 million? The trial court made no findings as to what the $4.4 million would mean. Those are the two numbers that are floating around. Those would be the two that you would point to, right? Here Dr. Karen, our expert, testified that the fair value was at the high end of the range at the time. At the maximum it would be the difference between $67 and $64.4 but here the $64.4 was certainly within the fair range. There was one estimated between $52 and $65. So certainly it was at the high end of the acceptable ranges. At maximum it would be the difference between $67 and $64.4. I see that the red light is blinking. We respectfully request that the court affirm the trial court's judgments with respect to the branch sales and wounded bank damages with the exception of the damages for the RFC sale and reverse the trial court's award of damages with respect to the RFC sale and the NACO sale and the stock proceeds offering. Thank you, Mr. Toto. Mr. Fountain, the case is taken into submission.